## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

GEORGE R. JOHNSON (dob: 8/22/1975) &
LISA MACK (dob 11/22/1975),

    Defendants.

**CRIMINAL COMPLAINT**

CASE NUMBER: 08-M-243

I, Kevin Klemstein, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

Count One: Beginning at least by November 1, 2008, through on or about November 21, 2008, in the State and Eastern District of Wisconsin, and elsewhere, **GEORGE R. JOHNSON and LISA MACK,** defendants herein, knowing traveled in interstate commerce, and caused another to travel in interstate commerce, and used and caused another to use a facility of interstate commerce, namely cellular telephones, with intent that a murder be committed in violation of the laws of the State of Illinois, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value, and did conspire with each other to do the same; All in violation of Title 18, United States Code, Sections 1958(a) and 2.

Count Two: On or about November 21, 2008, in the State and Eastern District of Wisconsin and elsewhere, **GEORGE R. JOHNSON and LISA MACK,** defendants herein, knowingly possessed a firearm during and in relation to, and in furtherance of, the crime of violence charged in Count One of this complaint; All in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 2.

I further state that I am a Task Force Officer with the ATF and a Milwaukee Police Department Detective, and that this complaint is based on the following facts:

Please see the attached affidavit of TFO Klemstein.
Continued on the attached sheet and made a part hereof:     X Yes     ___ No

KEVIN KLEMSTEIN
TFO - ATF / Detective, Milwaukee Police Department
Signature of Complainant

Sworn to before me and subscribed in my presence,

November 22, 2008           at Milwaukee, Wisconsin
Date           City and State

The Honorable Patricia J. Gorence
United States Magistrate Judge
Name & Title of Judicial Officer           Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin Klemstein, being duly sworn on oath, state as follows:

**I.    Background.**

1. I am employed as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and a Detective with the Milwaukee Police Department.

**II.    Purpose of the Affidavit.**

2. I submit this affidavit in support of a criminal complaint against George R. Johnson (dob 8/22/1975) and Lisa Mack of Chicago, IL.

**III.    Basis for Facts Establishing Probable Cause.**

3. Because this affidavit is submitted for the limited purpose of securing the criminal complaint, I have not set forth every fact known to me regarding this investigation. Rather, I have set forth those facts which I believe support a finding of probable cause. I also have set forth any exculpatory information of which I have knowledge.

4. The information contained in this affidavit is based upon my personal knowledge and investigation, my review of various documents and records (including consensually recorded conversations), as well as information supplied to me by other law enforcement agents, all of whom I believe to be truthful and reliable. Everything set forth in this affidavit is true to the best of my knowledge and belief.

**IV.    Facts Establishing Probable Cause.**

5. On November 18, 2008, an undercover law enforcement officer (UC) met with George R. Johnson (d/o/b 8/22/1975) in Milwaukee, WI. During the approximately hour-long conversation between the two, which was recorded and surveilled by other law enforcement officers, Johnson disclosed that he had been hired by an unknown female (UF), who resides in the Chicago area, to

murder an individual in Chicago. Johnson said that the UF would pay him $30,000 to murder this individual, whom Johnson implied was cooperating with law enforcement. Johnson asked the UC to be the driver for the murder plot. Based on their discussion, an agreement was struck whereby the UC would find a vehicle for them to drive; the UC would drive Johnson to Chicago; and the UC would act as the getaway driver after the murder. Johnson promised the UC $1,500 (out of the $30,000 payment from the woman who hired him) as compensation.

6. Johnson explained to the UC that he has been casing the intended victim's residence for the past month or so, knows where the intended victim lives, and provided a specific physical description. He did not provide a name or an exact address, however, and to date, law enforcement has been unable to identify the intended victim. Johnson told the UC that the UF who hired him has a photograph of the intended victim which she can provide to Johnson.

7. On November 19, 2008, the UC met with Johnson in a hotel room in the Milwaukee area. The meeting, which lasted approximately two hours, was both audio and video recorded. During that meeting, Johnson spoke more than once on the telephone to the UF. During one of the conversations, Johnson told her that he wanted her to obtain Illinois license plates that the UC could put on his vehicle for the night of the murder.

8. During the meeting, the UC showed Johnson a photograph of several guns that the UC said he could provide to Johnson, and Johnson identified which ones he wanted (including one that had a silencer attached). Johnson also again made reference to the $30,000 the UF was intending to pay him for the murder. By the end of the meeting, the UC and Johnson agreed that they would leave Milwaukee to drive to Chicago on Friday, November 21st, around 7:00 p.m.

2

9. According to criminal record checks, and according to Johnson himself during the November 18th meeting, Johnson has a previous criminal conviction for attempted murder, for which he served approximately 11 years in prison and is currently on parole. He also has a conviction from 2006 in Milwaukee County for felon in possession of a firearm for which he was incarcerated until approximately two months ago, when he was released.

10. Telephone records obtained from U.S. Cellular, for Johnson's cellular telephone (414-419-5617), reflect two Chicago-area telephone numbers which are called repeatedly by Johnson over the past weeks. Those numbers are 773-853-6840 and 773-885-4605. During one of the meetings between Johnson and the UC, Johnson referenced the fact that the woman had two telephone numbers. The telephone records from Johnson's cellular telephone reflect at least 18 calls between Johnson and those two numbers on November 18th, including one call that lasted fifty-one minutes; another that lasted eight minutes; and a third that lasted five minutes. The records similarly show at least five calls on November 19th, including one lasting almost 20 minutes, and another lasting over four minutes. Additionally, a comparison of the times of the calls that Johnson participated in during the meetings, with the telephone call detail records, reflect that Johnson was speaking to someone at one or the other of the two subject numbers while in the presence of the UC. For example, on November 19th, the UC was with Johnson at 7:06 p.m., when Johnson placed a call to the UF and spoke about her obtaining the Illinois license plates. That call is reflected on Johnson's call records: Johnson's phone placed a call to 773-853-6840 at 7:07 p.m., with the call lasting just over one minute.

11. Subscriber information obtained from Virgin Mobile indicates that the x6840 number is subscribed to by "Brandy Mack." Johnson had described to the UC the area of Chicago where

3

the woman who hired him lives. The subscriber information for Brandy Mack reflects an address in that same, specific area of Chicago. The subscriber information from Virgin Mobile on the x4605 number indicates it is subscribed to by Tiffany Johnson.

12. During the evening of November 20th, the UC and Johnson spoke, and Johnson confirmed with the UC that they would be leaving Milwaukee to drive to Chicago, for the purpose of murdering the intended victim, on November 21, 2008, beginning around 7:00 p.m.

13. On November 21, 2008, at around 7:00 p.m., the UC and Johnson met at the Milwaukee Greyhound Bus station. Johnson got into the passenger seat of the UC's car, which was wired for audio and video recording. The two drove south, across the Illinois/Wisconsin line, toward Chicago, to a location that law-enforcement had planned. The UC told Johnson during the meeting at the hotel that he had a source for firearms, and had shown Johnson the photograph of guns that his source had for sale. UC told Johnson that they would be meeting the firearms source (an undercover law enforcement officer, herein after referred to as UC2) at this location.

14. Once at that location, in northern Illinois, UC2 came to the window of UC's car. UC2 brought a duffel bag containing three guns, including one that had a silencer/suppressor attached. All three guns were functional but not loaded. The three talked about UC2 "renting" the guns to Johnson for a particular fee depending on how long Johnson wanted to keep the guns, and how much it would cost Johnson to purchase the guns. During this portion of the meeting, Johnson handled one or more of the firearms, and discussed prices with UC2.

15. The three then began to discuss ammunition for the guns. UC2 said he had the ammunition in his vehicle. UC2 and UC agreed to walk to UC2's car to get ammunition for Johnson. This was the signal for law enforcement agents to arrest Johnson.

4

16. In a post-arrest, *Mirandized* statement, Johnson told officers he and the UC were at the location because he needed a firearm. He explained that the two were planning to meet a woman, who he identified as Lisa Mack, at a location near 95th Street and the Dan Ryan Expressway when they got to Chicago after obtaining the guns. Johnson made clear that he had been hired by Mack to commit a murder in exchange for money, and that he needed the firearms for the murder. Johnson explained that while he was in prison in Illinois, he met an individual nicknamed "Hammer," who told Johnson to get in touch with Mack when Johnson was released from prison. Johnson did so. Johnson said he and Mack have been planning the murder plot for about a month.

17. According to Johnson, Mack was familiar with the intended victim of the murder plot, and Mack planned to identify the victim for Johnson once Johnson and the UC arrived in Chicago. Johnson said he was not sure why Mack wanted the intended victim dead, but Johnson believed that the victim was cooperating with law enforcement. Johnson described the intended victim as a light-skinned black male, bald, who walked with a limp. Johnson said the intended victim lived in the area of 110th and State Streets in Chicago.

18. Johnson further told agents that he was to receive $10,000 for carrying out the murder of the victim, and he intended to pay the UC $1,500 for driving. He said that he believed Mack had a "policy" (apparently a life insurance policy) on the victim, and that Mack may have policies on other individuals as well. According to the telephone records of the two telephones known to be used by Mack, a call was placed to an Oklahoma-based life insurance company during the day on November 21, 2008.

5

19. Through Chicago Police Department records, officers have confirmed that a Lisa Mack resides in Chicago. Mack has an arrest record, including an arrest approximately a year ago for aiding and abetting an escape. The address Mack gave during that arrest is a location very close to an address where the cellular telephones believed to be used by Mack were registering during the evening of November 21st (pursuant to the cellsite and GPS orders previously signed by this Court). However, despite attempts to do so, officers have been unable to locate Mack.

20. On November 22, 2008, during transport from the Waukesha County Jail to the courthouse, Johnson identified a photograph of Lisa Mack (dob 11/22/1975) as the woman who hired him to murder the intended victim.